United States District Court

For the Northern District of California

1

2

3

4

5

6

7

8          IN THE UNITED STATES DISTRICT COURT

9         FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11  CARMEN A GRIFFITH-ORTIZ,

12              Plaintiff,              No C-02-2431 VRW

13          v

14                                     ORDER

    JO ANNE B BARNHART, Commissioner

15  of Social Security,

16              Defendant.

17  _____/

18

19

20          Plaintiff Carmen A Griffith-Ortiz brings this action

21  under 42 USC section 405(g), challenging the final decision of the

22  Social Security Administration (SSA) granting her disability

23  benefits from December 25, 1996 to December 30, 1998, but denying

24  them for the periods before and after those dates.  Plaintiff

25  contends that her disability began earlier — on or about March 16,

26  1994 — and never ended during the period at issue.  Plaintiff

27  claims disability based on orthopedic and psychiatric conditions.

28  Now before the court are the parties' cross-motions for summary

United States District Court

For the Northern District of California

judgment.  The court **GRANTS** plaintiff's motion and **DENIES** the government's motion.

I

A

Plaintiff was born on May 25, 1955.  She alleges that she has been unable to work since March 16, 1994 due to physical and mental ailments.  Her work history includes experience as a restaurant manager, a floral manager, an office manager and an executive secretary.  AR 188.

Plaintiff was examined by numerous physicians during the five-year period covered by the voluminous administrative record on the instant appeal.  A consulting physician's review of medical records performed in June of 1999 listed sixteen different physicians and one psychologist, as well as other providers such as hospitals.  AR 765-69.  Reports from numerous other medical professionals not mentioned in the summary appear in the administrative record.  In a psychiatric consultative examination report prepared in January of 1999, plaintiff is quoted as saying "[M]y medical history is unbelievable," and reporting seventeen surgeries in the course of her life.  AR 825.  Plaintiff's medications at the time of that report included Flexeril, Soma, Vicodin, Paxil, Trazodone and Premarin.  Id.  The administrative record for this case contains several consultative medical examinations ordered by the SSA in connection with plaintiff's claim for benefits as well as treatment records dating back as far as 1985.

Plaintiff's medical records contain references to childhood problems including spina bifida, AR 761, treatment for

2

United States District Court

For the Northern District of California

rabies after being bitten by a rat, AR 725, 773, a head injury at age ten, id, and verbal, physical and sexual abuse.  Id, AR 824.  Plaintiff's medical history includes a hysterectomy at the age of 28.  Eg, AR 825.

In 1985, plaintiff underwent surgery for a hemorragic ovarian cyst.  AR 357-360.  Her medical records from that procedure indicated that she had previously had a hysterectomy, a cesarean section and two laparoscopic procedures.  AR 357.

In 1990, 1991 and 1992, plaintiff sought medical treatment for severe headaches, diagnosed as migraines and variously described as "persistent," "continuous" and "constant for 1-1/2 months."  AR 433-39.  For these headaches, plaintiff was prescribed Cafergot, Darvocet, Naprosyn, Motrin, and Vicodin.  AR 436.  These records also refer to a diagnosis of temporomandibular joint syndrome.  Id.

In 1993, plaintiff sought medical care for "abdominal pain with vomiting."  AR 428.  The clinic notes from one such consultation describe, based on plaintiff's report, "a history of a colicky kind of pain, lasting for twenty minutes to an hour, usually precipitated by eating, occasionally precipitated by anxiety."  Id.  The same notes also describe a hospitalization, in 1987, for abdominal pain and rectal bleeding, and "according to [plaintiff] twelve operations * * * based on adhesions between the bladder, ovarian cysts, and basically female problems."  Id.  Dr Stanley Rockman wrote "[i]t is difficult to ascertain exactly what the patient's symptoms are.  They [sic] are lots of possibilities; her history is suggestive of cholecystitis [but] her physical examination does not corroborate that."  Id at 429.

3

United States District Court

For the Northern District of California

On March 17, 1994, the day after plaintiff's alleged onset date of disability, plaintiff sought medical care for pain in her neck and back after she lifted a heavy box of yams at her job at Safeway.  AR 768.  Over the next seven months, plaintiff had an MRI, physical therapy, and at least nine doctor visits related to pain in her shoulder.  Imaging studies showed disc degeneration in plaintiff's C5-6 vertebra, AR 491, elsewhere described as a "small disc bulge."  AR 420.  Several physicians recommended conservative management, but plaintiff reported increasing pain and numbness in her neck and right arm.  Id, AR 768-69.  "Due to the severe nature of the ongoing symptoms despite conservative treatment * * * a repair of the C5-6 disc was suggested as an alternative" by orthopedic surgeon Dr Kenneth Light.  AR 491.

Plaintiff's case was reviewed by a neurologist, Dr Richard Gravina, who generally disagreed with the plan to perform surgery on plaintiff's neck.  Dr Gravina highlighted a portion of the radiologist's report noting no "evidence of cord compression," the mild nature of the disc bulge, and the fact that the "disc asymmetry is lateralized to the left, but the patient describes pain lateralized to the right arm."  AR 232.  Dr Gravina concluded: "[t]here is, therefore, no clinical correlation between the minor disc asymmetry at C5-6 and the patient's complaints." Id.  Dr Gravina concluded that plaintiff was "temporarily totally disabled." AR 238.

A second opinion letter dated October 26, 1994 concluded that it was "reasonable" to perform the planned surgery.  AR 366. On October 31, 1994, four days after Dr Gravina's report was written, Dr Light performed "discectomy and fusion" surgery on this

4

**United States District Court**

For the Northern District of California

area of plaintiff's neck.  "Postoperatively, the function of her hand improved immediately."  AR 491.

In August of 1995, plaintiff underwent a lengthy "independent orthopedic evaluation" in connection with her workers' compensation claim.  Dr Alan Zacharia diagnosed "upper extremity repetitive strain" as the cause of plaintiff's continuing "cervical, shoulder girdle, and right upper extremity discomfort."  AR 369.  Dr Zacharia explicitly disagreed with Dr Light's decision to proceed with surgery:

> The diffuse nature of her complaints (while localized to the right side) and the diffuse nature of her cervical discographic findings and cervical imaging findings were all strong reasons <u>not</u> to undergo limited surgery in this case.  All of Dr Light's disclaimers concerning the success rate of multiple level fusion were quite correct and should have convinced him not to perform surgery in this patient. I view with consternation the fact that he eventually did do surgery which, given the facts, could not have been successful in relieving Ms Ortiz.

Id.

In December 1995, plaintiff sought medical treatment for a respiratory infection.  She reported her medications to be Premarin only.  AR 633.  Other notes indicate she was taking Zoloft during this time.  AR 627.  Clinic notes over the early months of 1996 referred frequently to heart palpitations.  AR 626-32. Plaintiff underwent an exercise stress test to evaluate possible heart problems; the results proved essentially normal.  AR 653.

In May 1996, plaintiff went to a hospital emergency room with pelvic pain.  AR 624.  Clinic notes also indicate plaintiff complained of left hip and sacroiliac pain.  AR 623.  Follow-up x-rays in June 1996 showing no abnormalities.  AR 643.  Vicodin was nonetheless prescribed for the pain.  AR 623, 286.  After

United States District Court

For the Northern District of California

gynecological examinations failed to explain the pains, plaintiff was referred for a gastrointestinal consultation with Dr Stanley Rockman in July 1996 at which she stated she was "worried about the possibility of colon cancer. Her father had colon cancer and grandfather and a number of people on her father's side." AR 282. She also told the doctor that her then-sixteen-year-old son might have a brain tumor. Id. The doctor believed plaintiff to have irritable bowel syndrome but referred her for colonoscopy because of the family history of colon cancer, id; the colonoscopy results were normal. AR 279. In August 1996, plaintiff still complained of left side pelvic pain, now "radiat[ing] around back." AR 621.

In October 1996, plaintiff saw Dr Gershan at the North County Health Center in San Mateo for pain following an incident in which she "torqued" her neck, AR 620, the causes later variously noted to be "to prevent [a] piece of furniture from falling," AR 618, and "tripped over dog." AR 404. The doctor diagnosed acute tendonitis and injected cortisone and an analgesic. AR 620. On follow-up in November 1996, plaintiff reported "excruciating pain" in her right shoulder and neck. AR 618. The doctor then ordered MRI and prescribed Vicodin. Id. The MRI report observed small disc bulges at C4-5 and C6-7, but "no definite findings are seen to explain the patient's right radicular symptoms." AR 294. In early December, Dr Gershan saw plaintiff and discussed the MRI results. His clinic notes recorded pain and tenderness in plaintiff's neck and shoulder and a loss of sensation in her right hand. AR 614. A few days after this visit, Dr Gershan saw plaintiff again as a follow-up to an emergency room visit precipitated by a bee sting for which plaintiff received adrenaline injections. AR 613. On

United States District Court

For the Northern District of California

December 19, Dr Gershan referred plaintiff to a Dr Greenwald for her shoulder and neck pain.  AR 302.  Plaintiff missed three scheduled appointments with Dr Gershan in the latter half of December 1996.  AR 612.

On January 3, 1997, plaintiff saw Dr Gershan and reported that she had fallen on Christmas Day, hitting her right shoulder and hip.  AR 301.  She reported pain in her right shoulder and neck and in her lower back/sacral area.  Dr Gershan continued to follow plaintiff for these complaints, which no treatment seemed to alleviate over the next several months.  AR 603-606.  In addition, plaintiff was referred to orthopedic specialists.

In January 1997, plaintiff consulted an orthopedic clinic for "parasthesias in the ulnar side of her hands," tingling and numbness in both hands and a stiff neck.  AR 420.  The examining physician, Dr Stanford Pollack, wrote that plaintiff "is really not that much better from [the fusion surgery]" and referred her to neurology, commenting that treatment options were limited.  On follow-up, Dr Pollock stated "There is nothing we really have to offer this lady.  She has a chronic pain syndrome."  He prescribed two dozen Vicodin, "not to be refilled." AR 419.  Dr Gershan, however, refilled the Vicodin prescription several times.  AR 605.  In June 1997, plaintiff had MRI of her right shoulder, which revealed "no evidence of a tear through the rotator cuff tendons," "slight impingement" and "no further anomalies."  AR 411.

Meanwhile, in connection with her application for Social Security benefits filed February 7, 1997, plaintiff was referred for an occupational disability assessment with Qualified Medical Examiner Dr Michael Mosely, PhD, a psychologist.  Dr Mosely found

United States District Court

For the Northern District of California

plaintiff to have an IQ of 94 and a Global Assessment of Functioning (GAF) score of 90.  He gave no Axis I diagnosis, but gave an Axis II diagnosis of "301.9 personality disorder NOS with marked histrionic and hypochondriacal features."  AR 307, 309-310. Under test results, Mosely noted "[h]er protocol shows a neurotic triad.  Hysteria is scored at 97, hypochondriasis at 90, and depression at 71.  These patients typically manifest a variety of clinical symptoms in response to daily life stresses.  In cases where there are actual physical or mental conditions, their symptomatic responses are often greatly exaggerated."  AR 309.  He observed "no pain related behaviors during the course of the examination."  AR 307.

On June 29, 1997, according to clinic notes, plaintiff fell at a garage sale and landed on her left hip with her right knee "flexed behind."  AR 401.  The notes further stated that it took four paramedics to help plaintiff into an ambulance, in which she was taken to the emergency room.  Id.  X-rays were taken, a CT scan of her knee ordered, and a variety of palliative measures recommended for pain.  Id.  In addition the clinic notes stated "stop Vicodin (she is hooked on this med)," noted that a refill request had been refused and that plaintiff told the examiner she "got some from a friend."  AR 399.  "She is abusing this med."  Id.

Plaintiff went to numerous medical appointments for her knee and lower back discomfort in the months following the June 29 accident.  Eg, AR 385-399.

In early 1998, plaintiff saw doctors for heart tests, a further MRI of her spine, bronchitis, knee problems and depression. AR 375-76; 585-86; 665.  On January 12, 1998, a letter addressed

United States District Court

For the Northern District of California

"to whom it may concern" from a Dr Colin L Fox, MD stated "Ms Griffith is currently under my care for treatment of her Depression.  She will be disabled for the next 6 months."  AR 797. There are no other records in the adminstrative record from Dr Fox.

In April 1998, plaintiff had a full orthopedic exam at UCSF medical center in San Francisco, where she reported constant "moderate to occasionally severe" low back pain, "shooting and stabbing" left leg pain with both spasm and stiffness in back and leg most days.  AR 814.  Lumbosacral sprain/strain was diagnosed for these complaints, with conservative treatment including physical therapy recommended.  AR 816.

On July 15, 1998, plaintiff saw orthopedic surgeon Philip Bernstein in San Mateo.  He diagnosed her with fibromyalgia, left knee effusion, and cervical disk disease with "failed" cervical fusion.  AR 675-76.  He prescribed a TENS (Transcutaneous Nerve Stimulation) unit for the pain.  His memorandum stated "[t]his patient is unable to work on a permanent basis."  AR 675.

On August 21, 1998, plaintiff went to the emergency room in San Mateo.  Her discharge diagnoses were:  fibromyalgia, chronic degenerative joint disease, cervical strain and back strain.  AR 672-74.  She was released with a supply of both Soma and Vicodin and directed to follow up with Dr Bernstein.  AR 673.

In the autumn of 1998, plaintiff moved to John Day, Oregon, apparently because a close friend lived there.  AR 772. She sought public benefits from the state of Oregon and continued her quest for social security disability payments.  AR 752.

In December 1998, plaintiff began seeing Dr John G Jackson, a general practitioner.  AR 866.  She reported being on

United States District Court

For the Northern District of California

Vicodin, Soma, Flexeril, Paxil, Trazodone and Premarin.  She reported "a multitude of complaints, all centered around pain" in her neck, lower back, down the left leg.  Id.  She told the doctor she had been diagnosed with "impingement syndrome on the right shoulder, lateral epicondylitis in the right elbow and osteoarthritis to the right wrist * * * a left knee problem * * * had been talking to orthopedic surgeons about fusing more of her neck * * * [and] fibromyalgia."  Id.  The doctor refilled plaintiff's medications and referred her to a mental health agency.

The following week plaintiff returned, complaining of "severe pain in her back radiating into her right hip and into the right leg" as well as left hip and left leg.  AR 863.  "She essentially is complaining of pain almost everywhere, but really concentrates on pain in the low back radiating into her hips."  Id.  The doctor gave her handouts on fibromyalgia and encouraged her to see neurosurgeon Dr Mark Belza.  He warned her that he "did not think the disc bulges were a cause of her pain and that surgery probably would not be helpful."  Id.

On December 30, 1998, plaintiff saw Dr Belza, a neurosurgeon, who saw her "for evaluation of her multitude of pain complaints."  AR 725.  Dr Belza wrote:  "[plaintiff] describes severe pain and spasm in the left hip with distribution into the L5 distribution down the lateral aspect of the left thigh, anterior calf and ankle.  She has so much pain that she can't lie on her left side."  Dr Belza's report stated "it is very difficult * * * to ascertain the source of her [neck] problems," recommending further tests, AR 726.  Futher, "[w]ith regards to her low back, again her symptomatology can only be explained on the basis of her

bursitis that I find in the left hip." AR 727.  The doctor noted that plaintiff's "radicular type symptoms" were unusual with hip bursitis, and recommended an injection into the affected bursa. Id.  During a follow-up appointment with Dr Belza the following month, plaintiff stated that her right hand bothered her more than her left.  She also told the doctor that "[s]he has been to lots of doctors and * * * just wants to take her Social Security and live in peace without any further diagnostic work-up."  AR 724.

On January 5, 1999, plaintiff underwent a comprehensive psychological evaluation by David R Starr, PhD, a licensed psychologist.  This consultation was ordered by the Oregon Branch of Senior and Disabled Services Division in connection with plaintiff's application for disability benefits.  Dr Starr prepared a six-page report with several pages of attachments consisting of the results of psychological tests administered.  AR 823-33.  Dr Starr diagnosed plaintiff with Major Depressive Disorder (DSM IV, 296.20) and Undifferentiated Somatoform Disorder (DSM IV, 300.81). AR 827.  He assessed her GAF to be 60.  Id.  In explanatory comments, Starr wrote:  "Carmen Griffith is depressed. Furthermore, she has a tendency to spend an inordinate amount of her time obsessing about her physical functioning."  He recommended treatment for her psychological problems and a review by her physician of her regime of numerous medications.

On January 29, 1999, pursuant to a referral by Dr Jackson, plaintiff underwent an assessment at a mental health clinic in John Day.  Carol L Norton, M Ed completed a written evaluation based on plaintiff's visit.  It consisted of a three-page form filled out with dense, neat handwriting, AR 836-38, and a

United States District Court

For the Northern District of California

Multiaxial Evaluation Report Form filled out in the same hand, signed on January 29 by Ms Norton and later, on March 3, 1999 by psychiatrist Dr Thomas Heriza, MD.  AR 839.  The latter report listed three Axis I clinical disorders:  major depressive disorder, single episode, unspecified; undifferentiated somatoform disorder; and bereavement.  Id.  Ms Norton scheduled plaintiff for "supportive mental health services" and a psychiatric assessment.

In March 1999, Dr Heriza performed a psychiatric assessment and produced a report.  AR 840-43.  Under "impression," the report stated:  "She has a history of recurring multiple and clinically somatic complaints.  Some of the complaints are excessive but criteria for a somatization disorder would not be met.  However her symptoms are associated with both psychological and medical conditions. * * * Psychological factors, primarily her current depression plays a major role in the severity of her pain symptoms."  AR 842.  The stated Axis I diagnoses were "major depressive disorder, moderate severity, single episode without psychosis" and "Pain Disorder associated with both psychological and general medical conditions."  Id.  The report recommended that plaintiff avoid all narcotics and pursue alternative therapies for pain.  Also, the report stated "[b]enefit of consistent psychotherapy could not be over emphasized.  If the patient can deal with many of her psychological problems in a safe and ordered manner, she is likely to experience fewer somatic complaints and have less exacerbation of her symptoms."  AR 842.

On March 29, 1999, plaintiff visited Dr Jackson complaining of lower back pain, left lower quadrant abdominal pain and some urinary incontinence.  AR 753.  Plaintiff reported a

history of diverticulitis, and the doctor began treating her for this illness.

Within the next week, plaintiff went to the emergency room on a weekend complaining of pain in "left lower quadrant."  AR 753.  On April 6, plaintiff returned to Dr Jackson, still complaining of abdominal pain.  The doctor referred her for ultrasound and a barium enema.  Id.  Neither test revealed any cause for plaintiff's pain.  AR 752.

On April 29, 1999, Dr Jackson signed a letter to plaintiff's attorneys diagnosing her with "chronic pain" with a "poor" prognosis and stating that her condition was expected to last her "lifetime."  AR 845.

On June 16, 1999, plaintiff was seen, at Dr Jackson's request, by Dr Richard Koller, a neurologist.  He performed an electroneurographic exam pursuant to which he diagnosed plaintiff with carpal tunnel syndrome in her left arm.  AR 729-33.

On June 18, 1999, plaintiff went for an agency-ordered consultative examination with Dr Frank A Trostel, MD, an orthopedist.  His report noted that plaintiff was then back on three Vicodin per day, AR 757, and that she mounted the examining table without difficulty and displayed few notable limitations on exam.  Dr Trostel noted that the records showed possible orthopedic abnormality in the "right upper extremity and cervical spine," but that "in both areas when the patient is distracted nearly full range of motion is possible."  AR 759.  The neurological examination was "entirely within normal limits."  Id.  The report also noted some possible discrepancies: "[a]lthough her grip strength on the right is only 4 kg, when departing she gives a very

firm handshake," AR 758; "[s]he is observed ambulating from the office without a limp, carrying a rather large purse.  She can hold the purse in either of her upper extremities * * *.  She bends and twists her head, apparently looking for a cigarette and lighter, which she proceeds to manipulate with both hands."  AR 759.

In late June, plaintiff was taken to the emergency room by ambulance after "a false wall fell on top [of] her" "at the Fairgrounds."  AR 771, 851.  She subsequently saw Dr Jackson and reported numbness in her left foot.  AR 851.

On July 13, 1999, plaintiff underwent a further agency-ordered consultative examination with a psychologist she had not seen before, Dr William Trueblood, PhD.  Plaintiff then reported her medications to be Vicodin, Paxil, Flexoril and hormones.  AR 771.  The report noted that plaintiff's hygiene and grooming were "very good," but that she "seemed to be in pain, shifting some in her chair and standing for part of the interview."  AR 772.  Dr Trueblood concluded:  that plaintiff was depressed, largely because of her pain and physical limitations; that she did not have a personality disorder; that she had no substantive cognitive impairment, but possible "inefficiency in cognition due to pain and medication effects;" and that plaintiff did not malinger.  AR 774-75.  Dr Trueblood diagnosed Depressive Disorder NOS and "psychological factors affecting physical condition" with a GAF of 60.  Id.

On August 12, 1999, plaintiff visited Dr Jackson complaining of "left hip and buttock pain radiating to the left leg * * * going on for a couple of weeks," stating that at the fairgrounds she had to lean against a pavilion for twenty minutes

United States District Court

For the Northern District of California

before she could walk because of the pain.  AR 850.  Plaintiff returned on August 23 with "continued pain in her left lower back radiating to the left leg" and incontinence.  AR 849.

Soon after, plaintiff returned to the San Francisco Bay area "very precipitously because she was beat up by her boyfriend." AR 869.  On October 5, 1999, she paid a first visit to Dr Patrick Pennock, MD in South San Francisco.  On that and two subsequent visits the same month, plaintiff complained of severe low back pain radiating down her left leg.  AR 869-73.  On the last of these, plaintiff was "sitting on the table writhing in agony, crying" and was referred to a neurosurgeon for MRI and sent to the hospital emergency room.  AR 873.

There the medical evidence in the record ends.


**B**

On February 4, 1997, plaintiff submitted an application for social security benefits.  AR 144.  Her application stated that other disability benefits ended on November 1, 1996.  Id.  She gave as the bases for her disability claim "back fusion [and] pain (neck, shoulder, r[igh]t arm/hand)," heart palpitation and anxiety. AR 127.  The SSA denied plaintiff's claim, stating, <u>inter alia</u>, that the back and arm conditions "do no significantly limit your ability to engage in ordinary activities" and that plaintiff could return to work as a restaurant manager.  Id.  On July 19, 1997, the SSA denied plaintiff's request for reconsideration.  AR 132.

Plaintiff requested a hearing, which took place on November 17, 1999 before an Administrative Law Judge (ALJ) in Pendleton, Oregon.  (It was while her request for benefits was

United States District Court

For the Northern District of California

pending that plaintiff moved to John Day, Oregon, then back to the Bay area.  Instead of requesting a new hearing date in the Bay area, she drove back to Oregon for the hearing.  AR 101.)  AR 55. Plaintiff stated at this hearing that she suffered pain in several places, including her arms, shoulders, neck, left hip and back, preventing her from sitting or standing for long periods of time. AR 70, 73-75.  Plaintiff also reported suffering fatigue, impaired concentration, panic attacks, difficulty making decisions, difficulty sleeping, kidney problems and carpel tunnel syndrome. AR 80, 82-85, 87, 96-97.  Plaintiff testified that she was then taking Paxil, Premarin, Vicodin, Trasidel and receiving injections of Toretol to her hips, AR 76-77, and that their side effects included confusion and fatigue.  AR 88.

        In closing, plaintiff's counsel argued at length that somatoform disorder, or, alternatively, affective disorder/depression should form the basis for a finding that plaintiff was disabled:

> Ms[] Griffith is not capable of competitive employment in a full-time basis anymore for a number of reasons.  The first reason is because I believe she meets listing 12.07 for somatoform disorder * * *.  The somatoform disorder is mentioned throughout the record, particularly by a state consultative examiner in Exhibit 57F at page five as well by her own treating psychiatrist in 59F, page four.

AR 117-120.  The ALJ questioned the applicability of somatoform disorder because plaintiff was thirty-eight years old in 1994, the alleged onset date, and plaintiff's attorney represented that she had no records documenting somatoform disorder prior to age

thirty.[1]

A vocational expert (VE) testified that the past jobs plaintiff had held fell into the sedentary – skilled or light work – skilled categories. AR 102-03. In response to the ALJ's questions, the VE testified that a person could form these jobs if able to sit for six of eight hours per day, but that carpal tunnel syndrome limiting fine manipulation could rule out many of them, as would the inability to tolerate moderate levels of stress. AR 105-08. The VE considered telemarketer jobs possible with the above-stated limitations, but not when the hypothetical was changed to include the side effects of drowsiness, nausea, impaired concentration, irritability and memory loss. AR 109-10. Upon questioning by plaintiff's attorney, the VE testified that telemarketer jobs in which people got angry at the caller would be too stressful for someone unable to tolerate moderate levels of stress, and that an individual who was subject to bouts of anger due to pain and/or consistently late to work and missing two or three days of work per month due to pain and depression would not be able to maintain competitive employment. AR 116.

On February 10, 2000, the ALJ issued a decision concluding that plaintiff was disabled on – but not prior to – December 25, 1996, and that plaintiff's disability ceased on December 30, 1998. AR 22. The ALJ made the following findings: (1) plaintiff was disabled within the meaning of the Social Security Act beginning December 25, 1996, and had not engaged in

---

[1] Onset before age thirty is one of the criteria for somatoform disorder in the Listing of Impairments in the social security regulations, 20 CFR Part 404, Subpt B, App I § 12.07, discussed _infra_.

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

substantial gainful activity through the date of the ALJ's decision; (2) plaintiff had degenerative disk disease, carpal tunnel syndrome, and depression; (3) as of December 25, 1996, plaintiff's impairments prevented her from performing sustained or prolonged standing, walking, sitting and lifting, rendering plaintiff disabled as of December 25, 1996; (4) there was medical improvement as of December 30, 1998, which was related to plaintiff's ability to perform work; (5) prior to December 25, 1996, and after December 30, 1998, plaintiff had the residual functional capacity to lift ten pounds, walk or stand for two hours in an eight-hour day, but could not work at heights; (6) prior to December 25, 1996 and after December 28, 1998, plaintiff's past relevant work as an account executive, office manager and executive secretary did not require the performance of work-related activities precluded by the stated limitations; (7) prior to December 25, 1996 and after December 28, 1998, plaintiff's impairments did not prevent plaintiff from performing her past relevant work; and (8) plaintiff was entitled to a closed period of disability, commencing December 25, 1996 and ceasing on December 30, 1998.  AR 30-31.

        The ALJ attempted to summarize plaintiff's voluminous medical records.  Regarding fibromyalgia, the ALJ stated only: "Upon examination later that month * * *, although the claimant reported multiple joint pain, there were no significant orthopedic or neurological objective findings, and the examiner suggested fibromyalgia." AR 25.  Regarding somatoform disorder, the ALJ stated only this:  "[i]n January 1999, the claimant underwent initial evaluation at the Grant County Mental Health Center.

**18**

United States District Court

For the Northern District of California

Although accompanying notes suggest depression and a somatoform disorder, these notes do not contain any significant objective findings, or the results of psychological testing." AR 26. (The "notes" referred to actually consisted of the Multiaxial Evaluation Report completed by Ms Norton and signed by Dr Heriza at AR 839.)

Regarding pain, the ALJ stated that she found plaintiff's subjective complaints of pain "not fully credible." Id at 28. The ALJ summarized plaintiff's pain testimony thus:

> the [plaintiff] alleged that since her alleged date of disability, that she has experienced persistent pain in her neck, back, arms, and hands. The claimant also stated that she can only sit for 20-30 minutes, and walk or stand for 30 minutes, before she develops extreme pain. Moreover, the claimant reported that she continues to experience difficulty using her right hand for activities such as writing, holding, and gripping. The claimant also alleged symptoms such as fatigue, and poor concentration, and stated that she has difficulty making decisions.

AR at 28.

For the period prior to December 1996, the ALJ found the medical reports to lack objective findings of any underlying impairment, noting, inter alia: that after the fusion surgery, November 1994 x-rays of plaintiff's cervical spine displayed good fusion at the surgical site; absence of evidence of diagnostic testing "from October 1994, through December 1996, such as X-rays, tomography, magnetic resonance imaging, or nerve conduction studies, [showing] any significant abnormality;" lack of any "specialized course of treatment for [plaintiff's] complaints after her surgery * * * through December 1996;" an August 1995 comprehensive examination revealing "no serious findings;" and lack of documentation showing that plaintiff could not perform sedentary

19

United States District Court

For the Northern District of California

work activity prior to December 1996.  AR 28-29.  While citing Dr Zacharia's August 1995 report in support of the conclusion that plaintiff was not disabled prior to December 1996, the ALJ unaccountably failed to mention Dr Zacharia's conclusion that plaintiff could not return to her usual and customary job and that she was a "medically qualified injured worker."  AR 371.

For the period December 1998 to the date of decision, the ALJ similarly found "no objective findings" in the record in support of plaintiff's subjective complaints, noting that the December 1998 examination by Dr Belza revealed no motor strength deficits in any extremity and that plaintiff was "neurologically intact" with no signs of muscle wasting or atrophy, usually associated with inactivity.  AR 29.  The ALJ further found the record "devoid of any significant orthopedic or neurological findings," concluding that pain of the asserted level of severity would have resulted, after the passage of five years, in muscle atrophy or de-conditioning.  Id.  The ALJ further noted that plaintiff was independent in her activities of daily living; in January 1999, she reported gourmet cooking, walking, reading and sewing.  Id at 29.  Regarding Dr Jackson's April 1999 note stating that plaintiff was disabled for a "lifetime" by pain, the ALJ gave the opinion "minimal weight" because Dr Jackson "did not submit any objective evidence which supports this extreme opinion."  AR 26. The ALJ did not mention Dr Bernstein's July 1998 memorandum reaching essentially the same conclusion.

While the bulk of the ten-page decision focused on plaintiff's orthopedic complaints, the ALJ addressed more briefly plaintiff's "mental status and her ability to perform the mental

United States District Court

For the Northern District of California

demands of work."  AR 26-27, 29.   The ALJ described the 1997 report by Dr Mosely as "normal."  AR 26.   Regarding the January 1999 clinic notes from the Grant County Mental Health Center, the ALJ stated that "[a]lthough accompanying notes suggest depression and a somatoform disorder, these notes do not contain any significant objective findings, or the results of psychological testing."  Id. The ALJ summarized the January 1999 evaluation by Dr Starr as finding normal speech, thought process, memory, attention, and concentration, and "claimant's ability to perform the mental demands of work * * * intact," id, but failed to mention Starr's diagnoses of undifferentiated somatoform disorder and major depressive disorder.  Id.  Regarding the March 1999 evaluation by Dr Heriza, the ALJ noted findings of normal speech, memory, attention and concentration.  Id at 27.  Acknowledging the diagnosis of "major depression," the ALJ stated that Heriza "did not suggest any special mental limitations, and indicted [sic] that the claimant's ability to make social and occupational adjustment was only mildly limited."  Id.

The ALJ discussed the "B" criteria for finding a mental impairment of disabling severity as set forth in the social security regulations at 20 CFR Part 404.1520a:  activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation, that is, "exacerbations or temporary increases in syptoms or signs accompanied by a loss of adaptive functioning."  The ALJ noted that plaintiff was independent in her activities of daily living, prepared gourmet dishes, walked, read, and sewed.  AR 29.  ALJ discounted plaintiff's claim of serious mental limitations, stating that "the

United States District Court

For the Northern District of California

1  record does not show that she has been referred for more aggressive

2  therapy or been hospitalized for her symptoms. * * * it would seem

3  reasonable that if the claimant's allegations were considered

4  credible, that her treating sources would attempt more aggressive

5  treatment."  Id.  ALJ acknowledged that "the claimant may

6  experience some occasional depressive symptoms related to physical

7  problems [but was] not persuaded that her complaints are fully

8  credible."  Id.

9       The ALJ concluded that plaintiff had been disabled from

10 December 25, 1996 to December 30, 1998, and was otherwise capable

11 of performing sedentary work as an office manager, account

12 executive or executive secretary.  Id at 30.

13      On February 11, 2000, plaintiff requested review of the

14 ALJ's decision.  Id at 16.  On March 28, 2002, the Appeals Council

15 denied plaintiff's request for review, and the ALJ's decision

16 became final.  Id at 7.  On December 17, 2002, plaintiff commenced

17 the instant action for judicial review of the final decision.

18

19                              II

20      The court's jurisdiction is limited to determining

21 whether the SSA's denial of benefits is supported by substantial

22 evidence in the administrative record.  42 USC § 405(g).  A

23 district court may overturn a decision to deny benefits only if the

24 decision is not supported by substantial evidence or if the

25 decision is based on legal error.  See Andrews v Shalala, 53 F3d

26 1035, 1039 (9th Cir 1995); Magallanes v Bowen, 881 F2d 747, 750

27 (9th Cir 1989).  The Ninth Circuit defines "substantial evidence"

28 as "more than a mere scintilla but less than a preponderance; it is

United States District Court

For the Northern District of California

such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Andrews, 53 F3d at 1039. Determinations of credibility, resolution of conflicts in medical testimony and all other ambiguities are to be resolved by the ALJ. See id; Magallanes, 881 F2d at 750.  The decision of the ALJ will be upheld if the evidence is "susceptible to more than one rational interpretation." Andrews, 53 F3d at 1040.

"Disabled" is defined as "unable to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 CFR § 404.1527.

To determine whether a claimant is disabled and entitled to benefits, the SSA conducts a five-step sequential inquiry.  20 CFR § 404.1520; 20 CFR § 416.920.  Under the first step, the ALJ considers whether the claimant is currently employed in substantial gainful activity.  If not, the second step examines whether the claimant has a "severe impairment" that significantly affects his or her ability to conduct basic work activities.  In step three, the ALJ determines whether the claimant has a condition which "meets" or "equals" the conditions outlined in the Listings of Impairments in Appendix 1, Subpart P, Regulations No 4.  20 CFR § 404.1520.  If the claimant does not have such a condition, step four asks whether the claimant can perform her past relevant work. If not, in step five, the ALJ considers whether the claimant has the ability to perform other work which exists in substantial numbers in the national economy.  20 CFR §§ 404.1520(b)-(f); §§ 404.920(b)-(f).

23

In this circuit, cases distinguish among the opinions of three types of physicians:  (1) treating physicians; (2) non-treating examining physicians; and (3) those who neither examine nor treat the claimant.  Lester v Chater, 81 F3d at 830.  As a general rule, more weight should be given to the opinion of a treating source than a non-treating one.  Id.  Where the treating doctor's opinion is not contradicted by another doctor, it may be rejected only for "clear and convincing reasons."  Baxter v Sullivan, 923 F2d 1391, 1396 (9th Cir 1991).  Even if the treating doctor's opinion is contradicted by another doctor, the ALJ may not reject this opinion without providing "specific and legitimate reasons."  Murray v Heckler, 722 F2d 499, 502 (9th Cir 1983).

Conditions contained in the "Listing of Impairments" are considered so severe that they are irrebuttably presumed disabling, without any specific finding as to the claimant's ability to perform his past relevant work or any other jobs.  Lester v Chater, 81 F3d 821, 828 (9th Cir 1995); 20 CFR § 404.1520(d).  Claimants are conclusively disabled if their condition either meets or equals a listed impairment.  Id.  To "meet" a listed mental impairment, the SSA must find that diagnostic criteria in paragraph A of the impairment definition and a specified number of functional restrictions in paragraph B are met.  Id.  The purpose of the functional criteria in paragraph B is to measure the severity of the claimant's impairment.  20 CFR Part 404, subpart P, App 1 § 12.00C.

Even if a claimant's mental impairment does not meet the criteria specified in the listings, however, she must be found disabled if "the combination of [her] impairments is medically

United States District Court

For the Northern District of California

equal to any listed impairment." <u>Lester</u>, 81 F3d at 829; 20 CFR § 404.1526(a).  As especially relevant here, the claimant's illnesses "must be considered in combination and must not be fragmentized in evaluating their effects." <u>Lester</u>, 81 F3d at 829, citing <u>Beecher v Heckler</u>, 756 F2d 693, 694-95 (9th Cir 1985).

Plaintiff makes two general arguments in support of her appeal.  First, she asserts that the ALJ gave insufficient weight to evidence in the record from treating orthopedist Dr Hart, AR 223-25, neurologists Drs Gravina and Zacharia, neurosurgeons Drs Baiz and Belza and treating general practitioner Dr Jackson and treating orthopedist Bernstein; and that the ALJ should have recontacted Drs Jackson and Koller for clarification of the basis for their "fibromyalgia diagnosis."  Doc # 10, Pl's br at 23-27. Second, plaintiff asserts that the ALJ's conclusion that she retained the RFC to do full-time sedentary work ignores evidence that she could not sit for long periods of time and that she lacks the mental capacity to deal with the stresses of work.

Based on a careful review of the entire record, the court concludes that this case must be remanded to the SSA because (1) the ALJ failed to make proper findings in support of her decision that plaintiff's pain complaints were not credible; (2) the ALJ impermissibly ignored medical evidence in the record suggesting that plaintiff's pain complaints might be due to somatoform disorder and/or fibromyalgia; and (3) the ALJ failed to consider plaintiff's mental and physical impairments in combination in determining the extent of plaintiff's functional limitations.

\\

\\

A

This complicated case, reduced to its essence, turns on the apparent disparity between plaintiff's subjective pain symptoms and the underlying medical signs and findings. The Social Security Act directly addresses such cases:

> An individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability as defined in this section; there must be medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques, which show the existence of a medical impairment that results from anatomical, physiological, or psychological abnormalities which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all evidence required to be furnished under this paragraph * * * would lead to a conclusion that the individual is under a disability.

42 USC § 423(d)(5)(A). See also 20 CFR § 404.1529(b)(symptoms such as pain, fatigue, shortness of breath, weakness and nervousness will not be found to affect ability to do basic work activities absent medical signs or laboratory findings showing a medically determinable impairment).

The law governing the ALJ's responsibilities in cases involving excess pain is well-developed in this circuit. "Excess pain" is "pain at a level above that supported by medical findings." Chavez v Department of Health and Human Services, 103 F3d 849 (9th Cir 1996). If a claimant is able to produce objective medical evidence of an underlying impairment, an ALJ may not reject his subjective complaints based solely on lack of objective medical evidence to corroborate the alleged severity of pain. Moisa v Barnhart, 367 F3d 882, 885 (9th Cir 2004). If the ALJ finds the claimant's pain testimony not to be credible, the ALJ "must

United States District Court

For the Northern District of California

specifically make findings that support this conclusion." Id. Absent "affirmative evidence that the claimant is malingering," the ALJ must provide clear and convincing reasons for rejecting the claimant's testimony regard the severity of symptoms. Id.

Contrary to the ALJ's assertion, at no time during the period under consideration has the record been entirely devoid of medical signs and findings that could account for some degree of pain. According to the medical reports in the administrative records, plaintiff was diagnosed with degenerative disc disease in her neck, upper extremity repetitive strain, and, later, bursitis in her hip, carpal tunnel syndrome in her left arm and fibromyalgia. The ALJ identified no "affirmative evidence that the claimant is malingering" and was therefore required to provide clear and convincing reasons for rejecting plaintiff's testimony regarding the severity of her pain. The ALJ did not do so, but merely concluded that all the doctors who examined plaintiff were unable to identify clinical findings that could account for the degree of plaintiff's pain. Indeed, the ALJ's determination that plaintiff was "not credible" turned entirely on the absence of corroborating medical findings. This is a legally insufficient basis for rejecting a claimant's subjective complaints of pain.

"If an adjudicator could reject a claim for disability simply because a claimant fails to produce medical evidence supporting the severity of the pain, there would be no reason for an adjudicator to consider anything other than medical findings." Bunnell v Sullivan, 947 F2d 341, 347 (9th Cir 1991).

Finally, the ALJ appears improperly to have drawn the conclusion from plaintiff's ability to carry on routine activities

United States District Court

For the Northern District of California

of daily life that she was capable of full-time employment.  "The mere fact that a plaintiff has carried on certain daily activities * * * does not in any way detract from her credibility as to her overall disability.  One does not need to be 'utterly incapacitated' in order to be disabled."  Benecke v Barnhart, 379 F3d 587, 594 (9th cir 2004).  Moreover, "[i]n evaluating whether the claimant satisfies the disability criteria, the Commissioner must evaluate the claimant's 'ability to work on a sustained basis.'"  Lester, 81 F3d at 833; 20 CFR 404.1512(a).  In other words, plaintiff's admission that she spends some evenings sewing does not, as the ALJ suggested, mean that she could spend forty hours a week typing despite her diagnosed carpal tunnel syndrome.

B

The ALJ, moreover, ignored evidence in the record offering alternative explanations for plaintiff's myriad complaints – alternative, that is, to the explanation that plaintiff is exaggerating or fabricating her pain symptoms:  that plaintiff may have suffered from somatoform disorder and/or fibromyalgia.  As the foregoing discussion of the medical evidence and the ALJ decision suggest, however, the ALJ's mischaracterizations and omissions of evidence are not limited to that relating to somatoform and fibromyalgia.  The omission of these two diagnoses is particularly troubling because either would be sufficient to explain plaintiff's pain, and both are mentioned repeatedly by plaintiff's medical providers.  It is not necessary for purposes of this order, however, for the court to catalog the ALJ's other omissions exhaustively.

28

United States District Court

For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

        The social security Listing of Impairments defines

somatoform disorders, and the criteria for making a disability

determination based on such a diagnosis, as follows:

    12.07 <u>Somatoform disorders</u>: Physical symptoms for
    which there are no demonstrable organic findings
    or known physiological mechanisms * * * .

    A.    Medically documented by evidence of one of
          the following:

    1.    A history of multiple physical symptoms of
          several years duration, beginning before age
          30, that have caused the individual to take
          medicine frequently, see a physician often
          and alter life patterns significantly; or

    2.    Persistent nonorganic disturbance of one of
          the following:
          a. Vision, or
          b. Speech; or
          c. Hearing; or
          d. Use of a limb; or
          e. Movement and its control (eg,
          coordination disturbance, psychogenic
          seizures, akinesia, dyskinesia; or
          f. Sensation (eg, diminished or
          heightened).

    3.    Unrealistic interpretation of physical signs
          or sensations associated with the
          preoccupation or belief that one has a
          serious disease or injury;

20 CFR Part 404, Subpt B, App I § 12.07.  The one "A" finding must

be combined with, and be the cause of, two of the four "B" factors

(marked restriction of activities of daily living; marked

difficulties in maintaining social functioning; marked difficulties

in maintaining concentration, persistence, or pace; or repeated

episodes of decompensation, each of extended duration).

\\

\\

United States District Court

For the Northern District of California

The ALJ addressed plaintiff's claim of a disabling mental disorder in general terms, by finding plaintiff's claim "not credible" because she was not referred for "more aggressive treatment," AR 29.  This finding rests on an inaccurate reading of the record:  the record contained two recent evaluations recommending further treatment for her mental condition.  One of these evaluations, moreover, diagnosed plaintiff with somatoform disorder.  Dr Starr stated "[s]he has not been adequately treated for her depression and it is recommended that she participate in treatment apart from the medical therapy that she has been receiving," AR 827.  Dr Heriza stated "[b]enefit of consistent psychotherapy could not be over emphasized * * * [as] she is likely to experience fewer somatic complaints * * *."  AR 842.

Furthermore, whether plaintiff actually sought psychotherapy for her physical problems is not persuasive regarding the existence of disabling somatoform disorder.  It is in the nature of somatoform disorders that those afflicted do not think the key to resolving their physical complaints lies with a mental health provider; instead, they continually seek the assistance of physicians who treat physical disorders.  Plaintiff's voluminous medical file bears out, at least, that her experience of physical pain – and her search for physical cures – was nearly continuous throughout the period of claimed disability.

Because of the special characteristics of somatoform disorder, the ALJ's mental health analysis concluding that plaintiff was not disabled by other mental conditions such as depression was insufficient to reach the possibility that plaintiff was afflicted with somatoform disorder.  Somatoform disorder is a mental illness

United States District Court

For the Northern District of California

whose primary manifestation is physical symptoms, and could in this case have been an independent cause of plaintiff's otherwise unexplained affliction with severe, chronic pain.

Significantly, the ALJ disregarded the medical reports in which plaintiff was diagnosed with somatoform disorder.  20 CFR § 404.1520(a)(3) provides:  "We will consider all evidence in your case record when we make a determination or decision whether you are disabled" (emphasis added).  The ALJ either ignored, or merely mentioned in passing, the opinions of examining physicians.  But the ALJ must set out in the record the reasoning and the evidentiary support for interpreting the medical evidence, Tackett v Apfel, 180 F3d 1094, 1102 (9th Cir 1999), and must set forth clear and convincing reasons for rejecting the uncontradicted opinion of an examining physician.  Lester v Chater, 81 F3d 821, 830 (9th Cir 1996).

In Albalos v Sullivan, 907 F2d 871, 874 (9th Cir 1990), the Ninth Circuit explained:

> while we do realize that ALJs are required to process a large number of cases, it is important that they make determinations after application of the proper law to all pertinent evidence in the record, and that they fully explain the legal and factual bases for these determinations.  A failure to do so makes appropriate review almost impossible.

(emphasis added).

The mental health evaluations in the record do not all agree regarding the diagnosis of somatoform disorder, but all appear to agree that plaintiff's physical symptoms had a somatic component. At least one evaluator diagnosed plaintiff with somatoform disorder. The ALJ did not consider any of this evidence, even though

United States District Court

For the Northern District of California

1   plaintiff's attorney urged at the hearing that the somatoform

2   diagnosis be considered.

3          If the basis for a medical opinion is unclear, moreover,

4   the ALJ is required to obtain additional evidence about that opinion

5   by, for example, issuing a subpoena to the physician, submitting

6   questions to the physician or continuing the hearing to augment the

7   record.   Smolen v Chater, 80 F3d 1273, 1288 (9th Cir 1996).

8

9                                   2

10         Fibromyalgia, previously called fibrositis, is "a

11  rheumatic disease that causes inflammation of the fibrous connective

12  tissue components of muscles, tendons, ligaments, and other tissue."

13  Benecke v Barnhart, 379 F3d 587, 589-90 (9th Cir 2004).   Common

14  symptoms include

15          chronic pain throughout the body, multiple tender
            points, fatigue, stiffness, and a pattern of sleep
16          disturbance that can exacerbate the cycle of pain
            and fatigue associated with this disease.
17          Fibromyalgia's cause is unknown, there is no cure,
            and it is poorly-understood within much of the
18          medical community.   The disease is diagnosed
            entirely on the basis of patients' reports of pain
19          and other symptoms.   The American College of
            Rheumatology issued a set of agreed-upon diagnostic
20          criteria in 1990, but to date there are no
            laboratory tests to confirm the diagnosis.
21

22  Id at 590.

23         Regarding fibromyalgia, the ALJ stated only that "[in

24  December 1998], although the claimant reported multiple joint pain,

25  there were no significant orthopedic or neurological objective

26  findings, and the examiner suggested fibromyalgia."   AR 25.   The ALJ

27  neither rejected nor accepted this medical opinion, which was from

28  plaintiff's treating physician.

United States District Court

For the Northern District of California

The administrative record contains at least three different medical opinions by treating physicians (Bernstein, Jackson and Belza) stating that plaintiff suffered from fibromyalgia.  This medical evidence, however, is not as strong as it could be.  None of these records sets forth in any detail the basis for a fibromyalgia diagnosis.  It does not appear, moreover, that plaintiff was ever referred to a rheumatologist for follow-up by a physician in the relevant field of specialty.  Nonetheless, there is no contradictory evidence in the record stating that plaintiff did not have fibromyalgia.  The ALJ, therefore, was required to set forth "clear and convincing" reasons for rejecting these three medical opinions by treating sources.

As previously stated, moreover, if the basis for a medical opinion is unclear, the ALJ is required to obtain additional evidence about that opinion.  Smolen v Chater, 80 F3d at 1288.

As with the somatoform evidence, the ALJ made passing reference to only one of several medical records containing the fibromyalgia diagnosis, ignoring the others.  It was legal error to ignore the evidence of three treating physicians regarding a diagnosis that could explain plaintiff's pain and thus bear directly on her eligibility for benefits.

C

In a case in which a claimant appears to be suffering from both mental and physical ailments, the ALJ may not conduct a disability analysis that isolates each ailment from the others — which is precisely what the ALJ did here.  Rather, the ALJ is required to "review the symptoms, signs, and laboratory findings

United States District Court

For the Northern District of California

about [the claimant's] impairments to determine whether the combination of * * * impairments is medically equal to any listed impairment."  20 CFR § 404.1526(a)(emphasis added).  The ALJ erred as a matter of law in isolating the effects of plaintiff's physical impairments from those of her mental impairment.  Lester v Chater, 81 F3d at 830.  Where somatoform disorders are concerned, proper consideration of the one without the other is not only legally impermissible, it is from a practical standpoint impossible.

III

Having determined that the ALJ committed legal errors requiring reversal, the court must now determine the proper remedy. 42 USC section 405(g) provides: "The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [SSA], with or without remanding the cause for a rehearing."  In the normal case in which the ALJ is determined to have committed legal errors, a district court will remand the case for redetermination applying the correct legal standard or for enhancement of the record if appropriate.  Benecke v Barnhart, 379 F3d 587, 593.  Where the record has been fully developed and further administrative proceedings would serve no useful purpose, the district court should remand for an immediate award of benefits.  Id.

Where, as here, the ALJ improperly rejects the claimant's testimony regarding her limitations, and the claimant would be disabled if the testimony were credited, remand for the purpose of having the ALJ make findings regarding that testimony is inappropriate.  Lester, 81 F3d at 834.  Furthermore, where the ALJ

improperly rejects the opinion of a treating or examining physician, that opinion is credited "as a matter of law."  Id.

Thus crediting the disregarded evidence, and taking into account the evidence in the record as a whole, the court concludes: (1) that the ALJ erred at step #3 of the analysis and that plaintiff was disabled throughout the period for which she seeks benefits by pain caused by the combination of her mental and physical ailments; (2) that applying the undisputed testimony of the VE to the credited evidence regarding plaintiff's limitations, plaintiff would not be able to perform her past work or any other work available in substantial numbers in the national economy; and (3) there is no reason to augment the already voluminous record in this matter nor to delay further the resolution of a benefits application that has already been pending for nearly eight years.  The plaintiff is entitled to an award of benefits.

This matter is remanded to the SSA for payment of benefits to plaintiff.  The clerk is directed to close the file and terminate all pending motions.

IT IS SO ORDERED.

_____
VAUGHN R WALKER
United States District Chief Judge

United States District Court

For the Northern District of California